WILLIAMS TRUST, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 82276, 84833. Promulgated March 21, 1939.

*Chester J. McGuire, Esq.,* for the petitioner.
*Edward C. Adams, Esq.,* for the respondent.

614

## OPINION.

TURNER: That some trusts are of such nature as to require their classification as associations and hence as corporations within the meaning of the revenue acts (in the instant case, section 1111 (a) (2)

of the Revenue Act of 1932)[1] is well settled. *Morrissey* v. *Commissioner*, 296 U. S. 344; *Swanson* v. *Commissioner*, 396 U. S. 362; *Helvering* v. *Combs*, 296 U. S. 365; *Helvering* v. *Coleman-Gilbert Associates*, 296 U. S. 369; *Title Insurance & Trust Co.* v. *Commissioner*, 100 Fed. (2d) 482; *Lee H. Marshall Heirs*, 39 B. T. A. 101; *Cleveland Trust Co., Trustee*, 39 B. T. A. 429. Due, however, to the great variety of trusts, the dissimilarities in their purposes and operations, and the many variations in the powers of the trustees and the rights of the beneficiaries, it is at times difficult to distinguish between trusts which, as associations, are taxable as corporations and ordinary trusts dealt with under the statutory heading of estates and trusts.

Noting as an impossibility the translation of "the statutory concept of an 'association' into the particularity of detail that would fix the status of every sort of enterprise or organization", the Supreme Court, in *Morrissey* v. *Commissioner*, *supra*, after reviewing its prior decisions on the subject and after discussing the development and trend of rulings and regulations seeking to apply these decisions to cases arising from time to time, declared that the recurrent disputes emphasized "the need of a further examination of the Congressional intent." The Court then proceeded to pronounce certain principles which may be applied in determining whether or not a trust is an association and therefore a corporation within the meaning of the statute. The Court said in part:

What, then, are the salient features of a trust—when created and maintained as a medium for the carrying on of a business enterprise and sharing its gains—which may be regarded as making it analogous to a corporate organization? A corporation, as an entity, holds the title to the property embarked in the corporate undertaking. Trustees, as a continuing body with provision for succession, may afford a corresponding advantage during the existence of the trust. Corporate organization furnishes the opportunity for a centralized management through representatives of the members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise, who act "in much the same manner as directors," may provide a similar scheme, with corresponding effectiveness. Whether the trustees are named in the trust instrument with power to select successors, so as to constitute a self-perpetuating body, or are selected by, or with the advice of, those beneficially interested in the undertaking, centralization of management analogous to that of corporate activities may be achieved. An enterprise carried on by means of a trust may be secure from termination or interruption by the death of owners of beneficial interests and in this respect their interests are distinguished from those of partners and are akin to the interests of members of a corporation. And the trust type of organization facilitates, as does corporate organization, the transfer of beneficial interests with-

---

[1] SEC. 1111. DEFINITIONS.

(a) When used in this Act—

\* \* \* \* \*

(2) The term "corporation" includes associations, joint-stock companies, and insurance companies.

out affecting the continuity of the enterprise, and also the introduction of large numbers of participants. The trust method also permits the limitation of the personal liability of participants to the property embarked in the undertaking.

With respect to the form of its organization, its methods of operation, the rights of beneficiaries in the trust and its properties, the powers of the trustees, and the relationship of the trust and its beneficiaries to third parties, there can be no doubt that the Williams trust meets the above test of an association. The legal title to the real estate is vested solely in the corporate trustee and the rights of the beneficiaries are declared to be personal. The beneficiaries have no right of possession, management, or control of the trust estate and no widow, widower, heir, or devisee of any beneficiary has any right of dower, homestead, inheritance, or partition in the trust properties. The rights are solely against and through the trustees and do not constitute a claim, title, or interest in the properties themselves. Suits are to be brought and defended in the name of the trust and the beneficiaries are not necessary parties. The beneficial interests are represented by trustees' receipts which may be sold and transferred without termination of the trust and the existence of the trust is not affected by the death of any beneficiary. Neither the trustees nor the beneficiaries are personally liable for any money borrowed or for any other debt or liability of the trust and all persons dealing with the trust are required to look only to the property of the trust for the payment of their claims. Subject to the control of the beneficiaries through a majority vote, or a two-thirds vote on certain matters, the trustees, similar to the directors of a corporation, have the authority and power to do and perform any and all acts necessary in the management and operation of the properties belonging to the trust. The divorcement of the properties, their management, and operation from the beneficiaries is as well defined and distinct as if the properties had been transferred to any standard business corporation. And while it is not essential to the classification of a trust as an association that the beneficiaries have control over the trust comparable to that of stockholders over a corporation, *Hecht* v. *Malley*, 265 U. S. 144, and *Morrissey* v. *Commissioner*, *supra*, such comparable control is present in the instant case. Among other things the beneficiaries have the right, by a two-thirds vote, to remove and elect trustees. The property of the trust may not be sold and leases for periods of more than 25 years may not be entered into except with the consent of the majority in amount of the registered trustees receipts outstanding. It is also provided that the beneficiaries, by a two-thirds vote, may terminate the trust.

In stating "the salient features of a trust * * * which may be regarded as making it analogous to a corporate organization" and

which formed the basis for the comparisons just concluded, it is noted that the Court assumed a trust "created and maintained as a medium for the carrying on of a business enterprise and sharing in its gains." Previously in its opinion the Court, in discussing the characteristics of an association as distinguished from an ordinary trust, had said: "But the nature and purpose of the co-operative undertaking will differentiate it from an ordinary trust. In what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains." On the thought there expressed the petitioner rests its principal argument, which is that the Williams trust is not a trust organized "to provide a medium for the conduct of a business" and the sharing by the beneficiaries in its gains, but rather that it is a trust of the "traditional type" organized "to hold and conserve" the trust properties and to effect the sale thereof.

With this contention of the petitioner we are unable to agree. If, for instance, the beneficiaries herein had elected to organize a statutory corporation and to transfer the properties to it for purposes and functions similar to those of the Williams trust, there is little or no likelihood that it could be successfully contended that such a corporation, in owning, managing, leasing, and even selling the said properties, was not a business corporation engaged in business activities for profit. The only substantial difference between such a case and the instant case would be that on the one hand the functions were performed by an organization existing under statute, while on the other, by an organization of substantially the same form but existing under common law. Neither is it at all likely that the petitioner, with respect to a claim for the deduction of its operating expenses, would concede or argue that those expenses were not paid or incurred in the carrying on of a trade or business.

We are unable to conclude, as we did in *Broadway-Brompton Buildings Liquidation Trust*, 34 B. T. A. 1089, that the trust was organized for the "single purpose of liquidation." Nor does the trust instrument herein contain any declaration of a purpose to liquidate or sell the trust properties such as was present in *Frederick Pitzman et al., Trustees*, 36 B. T. A. 81. Furthermore in that case there was an absence of operation for profit such as we have in the instant case. That same obvious distinction exists between the instant case and *Lewis & Co.* v. *Commissioner*, 301 U. S. 385, a case strongly relied upon by petitioner.

Looking to the trust instrument for the purposes of organization, as we are directed to do by the Supreme Court in *Morrissey* v. *Commissioner*, *supra*, and *Helvering* v. *Coleman-Gilbert Associates*, *supra*,

we find no specific expression of purposes, but from examination of the powers and duties of the trustees it appears that the trust was to own, manage, operate, and lease the properties transferred to it, to pay all expenses incidental to such operations, and to distribute the gains derived from such activities to the beneficiaries at specified intervals, or, at the discretion of the trustees, oftener. The petitioner argues, however, that the inclusion in the trust instrument of a provision to the effect that the proceeds from the sale of any parcel of real estate were to be distributed to the beneficiaries and the omission of any provision authorizing reinvestment were tantamount to the declaration of a dominant purpose to sell the property. In our opinion, no such conclusion is indicated.

It may well be that the parties creating the trust did not desire the operations to extend beyond the management of the specific properties conveyed to the trust, but that fact alone does not change or alter the intent to own and operate the properties for profit unless and until they should be sold. Provision may be made for the termination of a corporation or association if, as, and when the property of such corporation or association is sold, but such provision is not, in our opinion, sufficient ground for the conclusion that liquidation or sale of the properties of the particular corporation or association was the dominant purpose for its organization. In *Swanson* v. *Commissioner, supra*, the operation was limited to a single property which the trustees had the power to sell. Furthermore it was provided that the trust might be terminated by such sale. There is no indication in the report of the case of any power in the trustees to reinvest the proceeds of such sale, and yet the Supreme Court held the trust to be an association. In *Lee H. Marshall Heirs, supra*, we have found nothing to indicate a power in the trustees to reinvest the proceeds from the sale of the trust property, but to the contrary the statement of powers and duties of the trustees indicates that the proceeds from such a sale were to be distributed. The trust instrument in *Cleveland Trust Co., Trustee, supra*, as in the instant case, required distribution of the proceeds from the sale of trust property and there appears to have been no power to reinvest. Similarly, in *Title Insurance & Trust Co.* v. *Commissioner, supra*, there appears to have been no specific power to reinvest the proceeds from the sale of the trust property, and yet at the time of its transfer to trust the said property was under option to sell. In each of the cases cited the organization in question was held to be an association.

In our opinion the facts of record indicate that the desire to unify and simplify the ownership and management of the properties for profit furnished the primary and dominant motive for the creation of the trust rather than the desire to sell or liquidate the properties.

The properties conveyed in trust obviously had a value of three million dollars or more and were producing for the trustors a substantial annual revenue. The management of the properties through an agent was becoming more complicated and increasingly difficult. John R. Williams had died the previous year, leaving his widow and three daughters to share in his estate, none of whom resided in Detroit. The daughters were married and had children of their own. Josepha W. Douglas, who resided in Colorado, was 59 years of age and in ill health. She had one child. Gershom Mott Williams, who had seven children, was 62 years of age and was suffering from angina pectoris. According to the record he spent all of his time away from Detroit. His death occurred in 1923. It is at once apparent therefore that centralized ownership and control of the properties were equally if not more essential and desirable to their continued operations for profit than for the purpose of effecting their sale.

The record does contain some testimony tending to show an expectation that the properties transferred to petitioner should ultimately be sold. There is also some testimony to the effect that the John R. Williams beneficiaries desired to speed liquidation of the properties, which desire played its part in the creation of the trust. It also appears, however, that these same beneficiaries desired that the activities relating to the management and leasing of the properties be conducted in a more formal manner than had been the case up to that time. They felt that the divorcement of actual ownership and management of the properties from the beneficiaries by transfer to such a trust would not only facilitate conveyance in the case of sale, but would also facilitate the management and leasing of the properties. It is not without significance that the speedier liquidation of the interests of the John R. Williams beneficiaries was accomplished as a result of the organization of the Williams trust but without the sale of more than two of the parcels of real estate transferred in trust, and, further, without interference with the continued activities of the trust in holding, managing, and leasing the remaining properties and in distributing the income derived therefrom to the remaining holders of trustees' receipts. We do not overlook the fact that two of the seven parcels of real estate were sold after conveyance to petitioner, but it should be noted that one parcel was under option of sale when the trust was created (in this connection see *Title Insurance & Trust Co.* v. *Commissioner, supra*), and the circumstances and occasion for the sale of the second parcel do not, so far as the record shows, indicate anything of particular significance unless it is that the sale provided the means for the John R. Williams beneficiaries to more speedily liquidate their interests in the trust without interfering with its continued existence as owner and manager of the remaining properties.

As an indication that the trust was never intended to serve any purpose other than that of holding and conserving the particular properties pending their sale, the petitioner points also to its policy of making net leases whenever possible so as to minimize its work. In that connection we do not understand that it necessarily follows that activities regularly carried on do not constitute the conduct of a business merely because the party in charge of the enterprise has through a particular method of operation been able to reduce those activities to a minimum. We are rather of the opinion that it is the nature and effect of the activities when related to the subject matter, due regard being given to the circumstances, which determine the question as to the conduct of a business. Furthermore only a minority of the leases negotiated in this instance were in a strict sense net leases, while the majority were either gross leases or had some features of a gross lease. In *Lee H. Marshall Heirs*, *supra*, the trust was determined to be an association, and yet it owned one parcel of property and that parcel was under a long term net lease. A similar situation existed in *Title Insurance & Trust Co.* v. *Commissioner*, *supra*.

The petitioner also regards as significant the fact that six of the seven parcels conveyed to it in 1920 were all that remained of some 126 descriptive units, or 57 parcels, of real estate devised to Josepha W. Douglas, Gershom Mott Williams, and John R. Williams in 1862 and 1876, all other parcels having been sold prior to 1920. Petitioner stresses the fact that 13 of the parcels sold were also located in the downtown section of the city of Detroit. The last of the said 13 parcels was sold in 1912. As we have indicated in our facts, the relative size and importance of the parcels sold with reference to each other or with reference to the parcels transferred in trust are not shown, and, in the light of other facts of record, we can not conclude that the sale of the 13 parcels and the other parcels sold necessarily has any bearing on the motive for transferring the remaining parcels in trust in 1920.

That the owning, managing, and leasing of properties for gain was of major and not minor importance is further indicated by the results of those operations as disclosed by the statement of operating cash receipts and disbursements. Although the evidence of record does not disclose the relative importance of the seven parcels of real estate transferred in trust in dollars and cents, it does appear that parcel No. 2 and parcel No. 6 were the major properties and were of approximately equal importance, while parcel No. 1 and parcel No. 5 were of the least importance. Parcel No. 2 was sold in 1926 for $1,200,000. Parcel No. 7 was sold in 1921, in accordance with the option existing prior to the creation of the trust, for $150,000. Taking into consideration the prices at which these properties were

sold as some indication of the value of the respective parcels, the rent derived from the leasing of the properties over the period of years from September 1920, when the trust was created, through the taxable year 1933 was not insignificant. The excess of receipts over disbursements amounted to $1,214,442.75, and this even though parcel No. 2, which had been second in the production of income, was sold in 1926.

In explanation of the fact that five of the seven parcels have not been sold but are still maintained as rental properties, the petitioner offered testimony to the effect that the market for certain of these properties was adversely affected throughout the period from its organization to 1936 by the agitation over the widening of Woodward Avenue, and from the late 1920's on by the general depressed state of the Detroit real estate market. We note, however, that in spite of these depressing factors the trustees, in keeping with the powers given to them and in the performance of their duties as prescribed by the trust instrument, succeeded in maintaining the properties as income-producing properties from the inception of the trust in September 1920 throughout the taxable years 1932 and 1933, which are before us. It is also noticeable that, except for the one or two years when the general business depression was most pronounced, the trustees succeeded in procuring substantially increased rents on practically every parcel of real estate it owned. According to the testimony of Williams, one of the managing trustees, parcels No. 1 and No. 5 were relatively unimportant, but even so, the rent on parcel No. 1 ranged from $3,000 net in 1921 to $6,000 under a gross lease for 1929, while on parcel No. 5 the rent was $12,343.41 for 1921, $6,099.84 for 1922, and from $5,400 to $12,000 per annum for 1923 through 1929, although the rents were substantially reduced on both properties for the years 1930 through 1933. In the case of parcel No. 3 the rents increased during the period from 1921 through 1932 from $6,999.96 to $20,000.04, and continued at the latter rate until the lessee became insolvent in 1933. In the case of parcel No. 4 the rents increased from $3,499.92 in 1921 to as high as $12,499.92 in 1931. Thereafter, even though the lease did not expire until April 30, 1934, the rents were reduced to $10,416.61 in 1932 and to $6,458.68 for 1933. For parcel No. 6 the rents were maintained throughout the entire period at $60,000 per year as provided by a long term lease with S. S. Kresge Co. The production of income through the ownership and leasing of the properties was obviously of major importance.

It is our opinion therefore that the facts in this case definitely show that a primary objective in the organization of the Williams trust was the unified and simplified ownership and management of its properties for the purpose of producing profits, and, since it was

organized and operated in much the same manner as a corporation, it is an association within the meaning of section 1111 (a) (2) of the Revenue Act of 1932. The fact that the properties may be, or might have been, sold if a favorable market had developed or should develop, thereby resulting in the dissolution of petitioner, does not alter the nature of the organization nor the character of its operations prior to such termination or dissolution.

*Decision will be entered under Rule 50.*